UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MONT CLAIRE AT PELICAN
MARSH CONDOMINIUM
ASSOCIATION, INC.,

    Plaintiff,

v.                                  Case No.:  2:19-cv-601-SPC-KCD

EMPIRE INDEMNITY
INSURANCE COMPANY,

    Defendant.
                                 /

## OPINION AND ORDER

Before the Court are Plaintiff's Motion for Confirmation of Appraisal Award and Summary Judgment (Doc. 119) and Defendant's competing Motion for Partial Summary Judgment (Doc. 120). For the reasons discussed below, the Court confirms the appraisal award and grants summary judgment to Plaintiff.

This is an insurance dispute. Plaintiff is a condominium association. Defendant insured Plaintiff's property. After hurricane Irma damaged Plaintiff's property, Plaintiff submitted a claim. Defendant agreed that the parties' insurance policy covered the loss, to some extent. Defendant paid $32,568.23. Plaintiff responded with a proof of loss for $16,509,316.38. Given the difference, Plaintiff demanded appraisal. Defendant refused.

Plaintiff filed a two-count complaint, bringing (1) a petition to compel appraisal and (2) a breach of contract claim. (Doc. 3). The breach claim asserts that Defendant refused to provide sufficient compensation or go to appraisal. (*Id*.). A couple months later, Defendant agreed to appraisal. But the parties could not agree on an umpire, so the Court appointed one. (Docs. 28, 32, 33). Over the next year, the appraisal panel determined the amount of loss to be $8,171,994.86 on a replacement cost value (RCV) basis and $6,599,810.67 on an actual cash value (ACV) basis.

But the appraisal award just inspired more litigation. Defendant unsuccessfully moved to set aside the award on the grounds that the panel wrongly attributed none of the loss to ordinance and law coverage. (Doc. 44). And Plaintiff unsuccessfully moved to confirm the award on three prior occasions. (Docs. 67, 99, 101). Meanwhile, the Court allowed discovery related to Defendant's first and sixth affirmative defenses. (Doc. 81).

Moving back towards a resolution, Defendant abandoned its first affirmative defense (Doc. 94), and Plaintiff abandoned its claim for recovery on an RCV basis (Doc. 98). All that remains is Plaintiff's claim for breach of contract, seeking recovery of the appraisal award on an ACV basis (minus the prior payment and deductible) and Defendant's sixth affirmative defense, asserting policy coverage and exclusion provisions. Through cross motions for

summary judgment, the parties now ask the Court to finally decide whether to confirm the award and enter judgment.

"[O]nce an [appraisal] award has been made, the only defenses that remain for the insurer to assert are lack of coverage for the entire claim, or violation of one of the standard policy conditions (fraud, lack of notice, failure to cooperate, etc.)[.]" *Three Palms Pointe, Inc. v. State Farm Fire & Cas. Co.*, 362 F.3d 1317, 1319 (11th Cir. 2004). The appraisal panel determined the amount of loss on both an ACV and RCV basis. RCV refers to the cost of replacing the damaged property. ACV is that figure minus depreciation. Defendant's main defense is that two policy provisions limit Plaintiff's recovery to how much it spent on repairs and the ACV of any unrepaired damage. This matters because the appraisal panel's ACV award for the property's roofs totaled $3,387,009.23, but Plaintiff has spent only $2,413,143.60 in repairs.

The Court construes provisions of an insurance policy "in accordance with the plain language of the [policy] as bargained for by the parties." *Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 774 (Fla. 2023) (citation omitted). The Court must read the policy "as a whole" and "undertake to give every provision its 'full meaning and operative effect.'" *Id*. Moreover, "it has long been a tenet of Florida insurance law that an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer."

3

*Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 950 (Fla. 2013) (cleaned up).

Defendant first cites the "Optional Coverages" section of the policy. According to Defendant, the "Replacement Cost" subsection limits Plaintiff's recovery to the amount it spent to repair the property. That provision provides:

> **3.   Replacement Cost**
>   **a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.
>
>    \*   \*   \*
>   **e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)**, or **(3)**, subject to **f.** below:
>
>    \*   \*   \*
>   **(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

(Doc. 119-1 at 45). But this provision explicitly applies to claims brought "on a replacement cost basis." (*Id.*).[1] Recall, Plaintiff has abandoned any claim for recovery on an RCV basis and seeks only an ACV award. And the policy contemplates Plaintiff doing just that, without limitation:

> **c.  You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis.** In the event you elect to have loss or damage settled on an actual cash value basis, you may still

---

[1] The Replacement Cost provision refers to RCV coverage even though it does not use the term RCV. The policy language makes this clear by treating ACV and Replacement Cost as alternative valuation bases and by capping Replacement Cost at the amount actually spent to repair or replace the property. And the parties requested the appraisal panel to determine both an ACV and RCV award, further evidencing "Replacement Cost" is a reference to RCV.

> make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

(*Id.*) (emphasis added).

In short, the "Replacement Cost" provision provides that Plaintiff may choose how the loss is valued—on an ACV or RCV basis. Plaintiff chose ACV. The provision also caps RCV by the amount the insured spends repairing the property but provides no such cap for Plaintiff's ACV claim.

This contract is similar to others the Court has considered in that "[a]n ACV award does not hinge on how much is actually spent to complete the repairs[.]" *Breakwater Commons Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:20-CV-31-JLB-NPM, 2021 WL 1214888, at *4 (M.D. Fla. Mar. 31, 2021), *appeal dismissed*, No. 22-10713, 2023 WL 3918493 (11th Cir. June 9, 2023). Despite this, Defendant argues that the optional coverage provision for RCV somehow limits ACV. The plain language of the policy, as drafted by Defendant, does not provide this Trojan horse.

Defendant next cites the policy's "Loss Payment" provision. According to Defendant, this provision also allows Defendant to limit Plaintiff's recovery to the amount it spent to repair. It provides:

> **4. Loss Payment**
>    **a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>      **(1)** Pay the value of lost or damaged property;

5

> **(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;
>
> **(3)** Take all or any part of the property at an agreed or appraised value; or
>
> **(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

(Doc. 119-1 at 41). Unlike the Replacement Cost provision, the Loss Payment provision may limit Plaintiff's recovery, at Defendant's option, to the cost of repairs.

The only problem is Defendant offers nothing to show if or when it exercised its option to pay repair costs. Just below the Loss Payment provision, the policy provides that Defendant "will give notice of [its] intentions within 30 days after [it] receive[s] a sworn proof of loss." (*Id.*). There is no evidence of such a notice in the record.

Instead, the record evidence suggests that Defendant did not elect to pay repair costs. On June 20, 2019, Plaintiff submitted its proof of loss. (Doc. 1-2). At that time, Plaintiff had "never presented evidence . . . that repairs had been performed and finalized." (Doc. 72 at 24). Nor could Plaintiff have presented such evidence—Plaintiff did not contract for repairs until November 2019. (Doc. 102-11). Yet, one year earlier on September 6, 2018, Defendant issued a check for $32,568.23 to Plaintiff for its property damage. (Doc. 119-2 ¶ 4). Defendant has made no other payment to Plaintiff. Presumably, the

6

$32,568.23 was an ACV payment. So far as the Court can tell, Defendant did not argue that repair costs cap ACV until years after the proof of loss and appraisal award.

Defendant cites *Triton* for the proposition that this Court has "recognized the validity of Empire's defense concerning the amounts actually spent trumping any greater appraisal award ACV amount." (Doc. 120 at 11 (citing *Triton Renovation, Inc. v. Empire Indem. Ins. Co.*, No. 2:20-CV-432-JES-NPM, 2023 WL 4362509, at *3 (M.D. Fla. July 6, 2023)). But in *Triton*, the Court held only that Defendant may assert its defense via summary judgment, not that its arguments are meritorious. The parties have not briefed summary judgment yet in that case. So *Triton* is not on point here. Rather, this Order may be on point in *Triton*.

The theme throughout Defendant's argument is that repair costs must cap Plaintiff's recovery or Plaintiff will enjoy a windfall. But, as a factual matter, this may not be so. For one, it is unclear whether Plaintiff satisfied its obligations for the roof repairs. Defendant claims it has "establish[ed] there were no further bona fide charges remaining through the testimony of Mont Claire's corporate representative." (Doc. 129 at 2). But the Court has read the entire deposition transcript, and defense counsel did not exactly nail down that fact. At times, Plaintiff's corporate representative stated that Plaintiff is done

7

paying for the repairs.[2]  But at other times, he suggested that Plaintiff still owe its general contractor.[3]  Defense counsel has also noted that Plaintiff replaced its roofs using materials that are "modestly cheaper to install" than the original materials.  (Doc. 102 at 3).

And aside from the facts, Defendant's contract interpretation is subject to a similar windfall criticism.  Defendant's interpretation, capping ACV at repair costs, could result in a windfall for insurers.  What if an insured receives an ACV payment but does not repair its property?  Can the insurer demand that the insured return the money, even though the insured suffered a covered loss?  Defendant's logic leads to this result, even though its policy has no provision limiting ACV in this way.

---

[2] (*See* Doc. 111-2 at 20 ("Q.  Right.  And that -- at least the roof replacements have been paid in full.  Is that right?  A.  To my knowledge, yes, within -- well, I can't attest to that.  Okay.  Q.  Well, you don't owe -- you don't owe anything more for roof replacement, do you? . . . A.  No, sir"); at 98 ("Q.  And is it your understanding that you -- under your understanding, as a layperson, that the Association has no further out-of-pocket expense that would be ultimately payable by the Association itself for any roof replacement work done by Venture? . . . A.  I would hope so.")).

[3] (*See* Doc. 111-2 at 21 ("I believe it is a partial payment.  I don't believe it's the complete payment[.]"); at 58 ("Well, we paid them for part.  Again, that two-million-plus dollars is not everything that relates to the roof work, okay?  There's still the factor that we haven't paid Venture themselves for their work done during the replacement of the roofs."); at 78 ("Q . . . [D]o you know whether -- regardless of what happens in the litigation, whether the Association is obligated to pay any more money out of its pocket to anyone for roof replacements? . . . A.  At this point, I can't answer."); at 99 ("Q.  Right.  So, based on what everybody knows now, okay?  -- based on what you know now, there is no reason for the Association to pay any more money out of its pocket to Venture?  Is that fair? . . . A.  No.  I disagree.")).

These considerations support summary judgment for Plaintiff, but do not decide the matter. Ultimately, the parties' bargained-for policy language controls. Defendant drafted the contract and could have expressly included a repair-costs cap for ACV, as it did for RCV. Defendant could have avoided this by electing to pay only repair costs at the start, after receiving Plaintiff's proof of loss (per the Loss Payment provision). Defendant did neither of these things.

Apart from relying on the two policy provisions, Defendant makes a few other miscellaneous arguments. The Court rejects them all. The Court will not entertain Defendant's line-item objections to the appraisal award (Doc. 119-4 at 10-13). Defendant does not attempt to support those objections in the summary-judgment briefing. And the Court finds them inconsistent with its past orders describing the scope of review of an appraisal award. (*See, e.g.*, Docs. 60, 63).

Defendant also argues Plaintiff has not sufficiently plead and established a breach of the policy on a couple of grounds. The elements of breach of contract are "(1) the existence of a contract; (2) a breach of the contract; and (3) causation of damages as a result of the breach." *Cole v. Plantation Palms Homeowners Ass'n, Inc.*, No. 2D22-3068, 2023 WL 6278830, at *4 n.2 (Fla. Dist. Ct. App. Sept. 27, 2023). The parties agree that the policy is an enforceable contract. Defendant disputes, however, whether and when it breached the policy.

Defendant cites *J.P.F.D Invest. Corp. v. United Spec. Ins. Co.* to argue Plaintiff brought an unripe claim for breach of contract because Defendant had not yet refused to pay the appraisal award when Plaintiff sued. *See* 769 F.App'x. 698, 706 (11th Cir. 2019). To start, Defendant agreed to "waive any defenses and arguments that . . . a lawsuit is premature and/or unripe[.] (Doc. 59 ¶ 7). Regardless, *J.P.F.D.* does not prevent summary judgment. *J.P.F.D.* stands only for the proposition that, for purposes of a fee-shifting statute, an insured is not entitled to attorney's fees when it races an insurer to the courthouse before it incorrectly denies benefits. Unlike in *J.P.F.D.*, here "the claims adjusting process had broken down and the insurer was no longer working to resolve the claim[.]" *Id.* Defendant provided Plaintiff with an unsatisfactory payment and resisted appraisal as premature, forcing Plaintiff to seek judicial intervention.

Plaintiff's complaint broadly alleges that Defendant breached by "refusing to provide sufficient compensation for damages to the Property as due under the Policy[.]" (Doc. 3 ¶ 29). This allegation remains at the heart of the dispute today. The intervening appraisal award, that determined only the amount of loss (in effect determining how insufficient Defendant's payment was under the policy) did not change this. *See Synergy Contracting Grp., Inc. v. Fednat Ins. Co.*, 332 So. 3d 62, 67 (Fla. Dist. Ct. App. 2021) ("In this case, the appraisal process confirmed that Fednat had wrongly denied paying

10

Synergy $3,795.62 of benefits under this policy. Quantifying that amount served to expedite resolution of the substantive litigation in the county court; it did not wipe away Fednat's prior denial[.]").

In any event, given the posture of this case the Court would likely grant Plaintiff leave to amend its complaint to include allegations of Defendant's post-appraisal conduct. This useless exercise is unnecessary.

Finally, Defendant argues the appraisal award cannot evidence a breach because it's description of the damage does not mirror the policy language. Sure, the policy covers "direct physical loss or damage to Covered Property." And the appraisal panel determined the "loss sustained due to or related to Hurricane Irma." But in this context, the policy and panel are saying the same thing. The parties agreed that the appraisal panel would determine the loss under the policy. The award expressly "does not include losses associated with causes excluded under the policy." (Doc. 119-3 at 2). Defendant's wordsmithing is unpersuasive.

Plaintiff seeks a $6,148,949.12 judgment (the appraisal panel's $6,599,810.67 ACV award minus the $32,568.23 prior payment and $418,293.32 deductible). With no coverage defenses or other obstacles in the way, the Court must confirm the award and enter judgment for Plaintiff.

Accordingly, it is now

**ORDERED:**

1. Plaintiff's Motion for Confirmation of Appraisal Award and Summary Judgment (Doc. 119) is **GRANTED.**

2. Defendant's Motion for Partial Summary Judgment (Doc. 120) is **DENIED**.

3. The Clerk is **DIRECTED** to enter Judgment for Plaintiff and against Defendant in the amount of $6,148,949.12; deny all pending motions as moot; terminate all deadlines; and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on November 22, 2023.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record